**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

LIVIA STINSON,

Plaintiff,

v.

METROPOLITAN SEWER DISTRICT
OF GREATER CINCINNATI, et al.,

Defendants.

Case No. 1:24-cv-738

Bowman, M.J.

**MEMORANDUM ORDER AND OPINION**

Plaintiff Livia Stinson has filed a Complaint and Amended Complaint in this case, bringing claims under the Americans with Disabilities Act of 1990 (“ADA”), the Age Discrimination in Employment Act of 1967 (“ADEA”), and 42 U.S.C. § 1983. (*See* Doc. 16). This matter is before the Court on Plaintiff’s Motion for Partial Summary Judgment (Doc. 31) and Defendant City of Cincinnati’s Motion for Summary Judgment (Doc. 36).

For the following reasons, Plaintiff’s motion is denied and Defendants’ motion is granted in part and denied in part.

## I. Standard of Review

When reviewing a motion for summary judgment, “a court must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the non-moving party.” *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). Summary judgment is appropriate where “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(a). “Weighing of the evidence or making credibility determinations are prohibited at summary judgment - rather, all facts must be viewed in

the light most favorable to the non-moving party." *Id.* Where, as here, the parties have filed cross-motions for summary judgment, the Court considers each motion separately, viewing the evidence and drawing all reasonable inferences in favor of the nonmoving party.

After a moving party has carried its initial burden of showing that no genuine dispute of material fact remains, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to survive summary judgment, the non-moving party must present probative evidence from which a reasonable jury could find in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505 (1986). The court determines whether the evidence requires submission to a jury, or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

## II. Factual Background[1]

Plaintiff was employed by the City of Cincinnati from November 22, 1998 until July 7, 2024. (Doc. 23, Stinson Dep. at PageID 171, 462). At the time of her separation, Plaintiff held the position of Motor Equipment Operator 2 (MEO-2) in the Metropolitan Sewer District of Greater Cincinnati's ("MSD") Wastewater Collections Division. (*Id.* at PageID 183-85). Driving was an essential function of this position and it required a valid

[1] The following facts are drawn from the parties' proposed undisputed facts and, unless otherwise noted, are not genuinely disputed. (*See* Docs. 32-1, 37-1, 36-1, 39-1).

Commercial Class A Driver's License with a tanker endorsement, which Plaintiff maintained through the end date of her employment. (*Id.* at PageID 197-98). As a MEO-2, Plaintiff operated a flush vac truck used for sewer cleaning operations. (*Id.* at PageID 190). At the time of her separation, Plaintiff earned $65,375.41 annually. (*Id.* at PageID 184-85).

Plaintiff has chronic knee and lower back pain, which substantially limits her ability to stand and walk. (*Id.* at PageID 211). For approximately fourteen years prior to the events giving rise to this case, Plaintiff was prescribed oxycodone (Percocet) up to five times per day as needed and tizanidine every eight hours as needed for management of chronic pain. (*Id.* at PageID 215-16). In December 2022, Plaintiff's treating physician added OxyContin to her regimen. (*Id.* at PageID 216). Although disputed by Defendants (*See* Doc. 37-1 at PageID 933), Plaintiff testified that she took tizanidine and OxyContin only at night. (*Id.* at PageID 216-18). With respect to oxycodone, Plaintiff testified that it never made her drowsy, dizzy, or sedated. (*Id.* at PageID 218).

Between November 29, 2022 and November 17, 2023, Plaintiff was involved in four low-speed accidents while operating City vehicles. (*Id.* at PageID 225-26). Following the first accident, during which the garage door of the MSD facility closed on Plaintiff's truck, a post-accident drug screen was administered and ultimately reported as negative. (*Id.* at PageID 229-30; Seward Depo., Doc. 25 at PageID 498). The Medical Review Officer (MRO) noted a safety-sensitive comment, recommending further evaluations. (Stinson Depo., Doc. 23 at PageID 232-33; Seward Depo., Doc. 25 at PageID 498-99). Defendants referred Plaintiff to Dr. Timothy Henke, M.D., for a fitness-for-duty (FFD) evaluation. (Henke Depo., Doc. 21 at PageID 88-89). Henke observed no clinical signs

of impairment and conducted no physical exam or blood level testing. (*Id.* at PageID 92-93, 97). After requesting and receiving a note from Plaintiff's treating physician, which confirmed Plaintiff's medication and stated that "to his knowledge [she] has not had any issues performing her job duties," Dr. Henke cleared Plaintiff for full duty. (*Id.* at PageID 98-100; Brown Depo., Doc. 27 at PageID 693). Dr. Henke testified that had he seen Plaintiff for a pre-employment screening he would have imposed a no driving restriction because Plaintiff's medications could cause drowsiness. (Henke Depo., Doc. 21 at PageID 95).

Plaintiff was involved in three additional accidents. First, on August 25, 2023, the side of Plaintiff's truck contacted the metal frame of the MSD facility garage door. Plaintiff testified that she was forced to navigate a tighter-than-normal exit because of another truck parking crooked in the garage. A post-accident drug screen was administered and was reported as negative, with the MRO again recommending further evaluation. (Stinson Depo., Doc. 23 at PageID 239-40; Seward Depo., Doc. 25 at PageID 500-01).

On September 26, 2023, Plaintiff bumped a fence post while driving a dump truck. According to Plaintiff, she was directed to drive an unfamiliar truck without its plow attachment, leaving a protruding front piece not visible from within the truck. Plaintiff testified that while parking the truck she pulled in a little too far and "it bumped one little metal bar on the fence." (Stinson Depo., Doc. 23 at PageID 245-47; Seward Depo., Doc. 25 at PageID 501-02). No disciplinary action was taken in response to the incident, nor was a drug test administered because MSD's investigation supervisor determined the damage was insufficient to require one. (*Id.*).

Finally, on November 17, 2023, Plaintiff sideswiped a safety bollard near a gas pump, causing minimal damage to the truck's toolbox. (Stinson Depo., Doc. 23 at PageID 247-49). A post-accident drug screen was administered and again was reported as negative. (Stinson Depo., Doc. 23 at PageID 247-49; Seward Depo., Doc. 25 at PageID 503-04).

On December 14, 2023, Plaintiff underwent a second FFD examination with Dr. Henke. Dr. Henke asked her to stand on her toes and on each foot to assess balance, but did not perform blood-level testing, interview coworkers, or conduct any functional driving assessment. (Henke Depo., Doc. 21 at PageID 106-07). Henke testified that Plaintiff did not demonstrate dizziness and that any balance issues were attributable to orthopedic conditions. (*Id.* at PageID 106). As part of the examination, Dr. Henke reviewed and cited a 2021 Journal of Medical Toxicology article concluding that a majority of studies support an association between opioid use and neurocognitive impairment and noted Plaintiff's multiple accidents and medications. (*Id.* at PageID 107-08). Based on this information, he imposed a permanent restriction of "no driving during work hours." (*Id.* at PageID 116). Henke later testified he "could not rule out" medication side effects as contributing to the accidents, but acknowledged he had no direct evidence of impairment and that Plaintiff "may just be a poor driver." (*Id.* at PageID 110-13, 129).

Plaintiff requested several follow-up evaluations and submitted additional medical information in an effort to have the driving restriction lifted. To this end, in early 2024, she obtained optometry records demonstrating her vision exceeded Department of Transportation standards and submitted them through HR to Dr. Henke. (Stinson Depo., Doc. 23 at PageID 291-92; Henke Depo., Doc. 21 at PageID 155). Plaintiff requested a

new in-person FFD examination upon submitting the records. (Stinson Depo., Doc. 23 at PageID 299-300). On February 6, 2024, having reviewed the optometry records, Henke maintained the driving restriction, noting that “her vision at this time has nothing to do with the fact that she is still on high doses of multiple sedating narcotic medications.” (Henke Depo., Doc. 21 at PageID 155).

At the direction of her treating physician, Plaintiff voluntarily discontinued OxyContin entirely, returning her to the baseline at which Henke had previously cleared her to drive. Plaintiff submitted a note from her pain management physician noting the change. However, Henke maintained the restriction, stating that “[a]s this was just one of a number of sedating medications she was tak[ing] . . . my opinion is unchanged.” (*Id.* at PageID 156). Henke testified that he maintained the restriction because he “was worried that those accidents may have been caused by the medication.” (*Id.* at PageID 112). He further testified that if Plaintiff had stopped all of her medications entirely that his opinion would have changed. (*Id.* at PageID 116).

Plaintiff also challenged Dr. Henke’s restriction as unlawful or illegal. On January 2, 2024, Plaintiff emailed Shawntee Brown—a City representative who served as the designee regarding ADA accommodations—stating that she was “fighting this decision that was falsely made by Dr. Henke. Unlawfully illegally . . . .” (Stinson Depo., Doc. 23 at PageID 438). Plaintiff sent a second written communication to the City on February 23, 2024, similarly noting her belief that she was unlawfully discriminated and retaliated against. (Seward Depo., Doc. 25 at PageID 526-27, 635). In addition to the internal opposition, Plaintiff also filed multiple grievances through her labor union pursuant to the collective bargaining agreement, a charge of discrimination and retaliation with the Equal

Employment Opportunity Commission, and escalated her opposition to the Assistant City Manager, which prompted the involvement of the Director and Deputy Director of HR. (Seward Depo., Doc. 25 at PageID 489-90; Stinson Depo., Doc. 23 at PageID 208-09; Brown Depo., Doc. 27 at PageID 668). Defendants were aware of Plaintiff's various challenges to the restriction. (Seward Depo., Doc. 25 at PageID 489-490, 526-27, 635; Brown Depo., Doc. 27 at PageID 668). Brown testified that Plaintiff's labor union grievance "delayed the termination process." (Brown Depo., Doc. 27 at PageID 669).

As a result of the December 2023 restriction, Plaintiff was briefly placed on light duty, performing supply-stocking tasks in the garage. (Stinson Depo., Doc. 23 at PageID 277-78). From the date that assignment was terminated through her separation on July 7, 2024, Plaintiff received no pay from the City and was unable to collect unemployment because she remained employed. (*Id.* at PageID 282). Plaintiff testified that although she was told that no more light duty work remained, other employees were assigned to light duty during the period she was on unpaid status. (*Id.* at PageID 276).

On February 8, 2024, as part of the ADA interactive process, the City offered Plaintiff four alternate positions: three Clerk Typist 3 positions and a Storekeeper position. (*Id.* at PageID 303-07, 445). The salaries for these positions amounted to reductions in pay of $11,731 to $13,660 per year when compared to her MEO-2 salary. (*Id.* at PageID 303-04). No equivalent-pay positions were available citywide between February 8 and July 7, 2024. (Brown Depo., Doc. 27 at PageID 662-63). Plaintiff communicated that she was willing to accept one of the offered positions on a temporary basis while challenging the driving restriction, but Plaintiff testified that the City said that "if you take one of these jobs, it would be on a permanent basis." (Stinson Depo., Doc. 23 at PageID 311). Noting

that the jobs offered would amount to a demotion, Plaintiff indicated that she was not willing to do that. (*Id.*). On July 7, 2024, Plaintiff was medically separated from employment. (*Id.* at PageID 462).

Plaintiff applied for long-term disability benefits through Voya Financial, the City's group disability insurer. (Seward Depo., Doc. 25 at PageID 639-41). On June 27, 2024, Plaintiff's disability claim was denied, with Voya noting the lack of medical evidence of functional impairment and insufficient documentation "to support an impairing condition that would prevent [Plaintiff] from performing the occupational duties of MEO 2." (*Id.* at PageID 639-41). The decision stated that "Dr. Henke's opinion is based on risk and there is no medical evidence that supports your inability to drive." (Henke Depo., Doc. 21 at PageID 160-61; Seward Depo., Doc. 25 at PageID 639-41).

Plaintiff filed the instant action on December 23, 2024. In her First Amended Complaint, she brings three separate sets of claims. In Count I, Plaintiff asserts claims under the ADA, alleging that Defendants subjected her to an unlawful FFD medical examination or disability-related inquiry, failed to provide reasonable accommodation, and retaliated against her for engaging in protected activity. In Count II, Plaintiff brings an age discrimination claim under the ADEA. As noted below, Plaintiff has since stated that she does not intend to pursue this claim at trial. Finally, in Count III Plaintiff asserts under 42 U.S.C. § 1983 that Defendants violated her Fourteenth Amendment equal-protection rights through alleged disability-based discrimination and through alleged municipal policies, customs, or inadequate training related to FFD evaluations. (Doc. 16).

Plaintiff filed a Motion for Partial Summary Judgment as to her ADA claims in Count I. (Doc. 31). Defendants subsequently filed a Motion for Summary Judgment on all claims.

(Doc. 36). For the reasons provided below, the Court will deny Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment, with the exception of Count II, which Plaintiff no longer wishes to pursue.

## III. Plaintiff's ADA Claims (Count I)

The parties both move for summary judgment on Plaintiff's ADA claims. Plaintiff seeks judgment on her claims arising from the FFD evaluation, failure to accommodate, and retaliation. (Doc. 31, 32). Defendants seek judgment on those claims, arguing that the undisputed evidence establishes that the City had a legitimate basis to require the FFD evaluation, that Plaintiff was not qualified to perform the essential functions of her MEO-2 position following the driving restriction, that the City offered reasonable alternative positions that Plaintiff rejected, and that the subsequent medical separation was neither discriminatory nor retaliatory. (Doc. 36).

For the reasons below, the Court concludes that while the City had an objectively reasonable basis to conduct the FFD evaluation, genuine disputes of material fact remain concerning the individualized basis for the resulting driving restriction and Plaintiff's ability to perform the essential functions of her position. Because these factual disputes bear directly on the parties' accommodation arguments, neither party is entitled to summary judgment on Plaintiff's discrimination and failure-to-accommodate claims. The Court also finds that genuine factual disputes preclude summary judgment on Plaintiff's retaliation claim.

### A. Fitness-for-Duty Evaluation and Plaintiff's Qualification

The ADA generally prohibits an employer from "require[ing] a medical examination . . . unless such examination or inquiry is shown to be job-related and consistent with

business necessity." 42 U.S.C. § 12112(d)(4)(A). The employer carries the burden of proving the job relatedness and business necessity, and may satisfy that burden by presenting objective evidence supporting a reasonable belief that an employee's ability to perform essential job functions is impaired or the employee poses a direct threat to health or safety due to a medical condition. *Bates v. Dura Automotive Systems, Inc.*, 767 F.3d 566, 581 (6th Cir. 2014); *Kroll v. White Lake Ambulance Authority*, 763 F.3d 619, 623 (6th Cir. 2014).

Separately, to establish a claim of disability discrimination, Plaintiff must establish that she is a "qualified individual"—one who, "with or without reasonable accommodation, can perform the essential functions" of the position. 42 U.S.C. § 12111(8). In determining whether an employee can perform those functions, however, an employer may not rely on generalizations or assumptions about a medical condition, but must conduct an individualized inquiry into the employee's actual condition and ability to perform the particular job. *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923-24 (6th Cir. 2013); *Holiday v. City of Chattanooga*, 206 F.3d 637, 643-44 (6th Cir. 2000).

In this case, Defendants had sufficient objective evidence to investigate Plaintiff's fitness for duty. The MEO-2 position required Plaintiff to operate large City vehicles; she was involved in four accidents within a year, which Defendants viewed as preventable; and, after three of those incidents, post-accident drug testing was reported as negative, with the results accompanied by safety-sensitive comments recommending further evaluation because of Plaintiff's prescribed medications. (Stinson Depo., Doc. 23 at PageID 233, 242-43, 248-49; Henke Depo., Doc. 21 at PageID 88-89). Under these circumstances, Defendants had an objectively reasonable, job-related basis to

investigate whether Plaintiff remained able to perform her work safely. Thus, to the extent that Plaintiff contends Defendants lacked a sufficient basis to initiate the FFD process, she is not entitled to summary judgment on that basis.

This conclusion, however, does not resolve whether the resulting FFD determination and driving restriction were based on an adequate individualized assessment of Plaintiff's ability to perform the essential functions of her position. On that question, genuine issues of material fact preclude granting summary judgment to either party. Defendants point to Plaintiff's accident history, prescribed medications and potential side effects, the safety-sensitive nature of her work, and Dr. Henke's determination that she should not drive during work hours. They also note that Dr. Henke personally evaluated Plaintiff, reviewed her medical information and accident history, and reconsidered the restriction as additional evidence became available. (*See* Doc. 36 at PageID 901, 904-05; Henke Depo., Doc. 21 at PageID 100-13, 128-29, 157; Stinson Depo., Doc. 23 at PageID 265-69, 428-29).

Plaintiff, however, points to evidence from which a reasonable jury could question whether that determination reflected an individualized assessment of her actual ability to drive. (*See* Doc. 32 at PageID 761-62, 770-72; Doc. 39 at PageID 973-74). Specifically, no supervisor or coworker reported observing Plaintiff impaired at work. (Brown Depo., Doc. 27 at PageID 664; Seward Depo., Doc. 25 at PageID 532). Plaintiff testified that she took tizanidine exclusively at night because it caused drowsiness or sedation, that she took OxyContin once daily at night, and that oxycodone caused her no drowsiness, dizziness, or sleepiness. (Stinson Depo., Doc. 23 at PageID 215-18). Her treating physician reported no known performance problems, and Dr. Henke had previously

cleared her to drive while taking substantially the same medications. (Henke Depo., Doc. 21 at PageID 97, 99-100; Brown Depo., Doc. 27 at PageID 693).

Plaintiff emphasizes that although Dr. Henke performed a balance assessment, he did not attribute any balance difficulty to her medications. (Stinson Depo., Doc. 23 at PageID 268; Henke Depo., Doc. 21 at PageID 106). He otherwise performed no functional driving assessment, interviewed no coworkers, could not determine whether the medications contributed to any of the accidents, and acknowledged that Plaintiff may just be a poor driver. (Henke Depo., Doc. 21 at PageID 106-07, 109-12). In explaining the basis for his determination, Dr. Henke relied in part on a medical literature review concerning opioid use and driving performance, but acknowledged that he had no "direct evidence" beyond "general knowledge and the article." (Henke Depo., Doc. 21 at PageID 108, 110). Plaintiff further points to Voya Financial's denial of her claim for long-term disability benefits. In its denial, Voya concluded that Dr. Henke's opinion was "based on risk" and that "there is no medical evidence that supports [Plaintiff's] inability to drive." (Henke Depo., Doc. 21 at PageID 160-61; Seward Depo., Doc. 25 at PageID 639-41). Dr. Henke further testified that he would impose a driving restriction "from day one" on an employee with the same medication profile, and maintained Plaintiff's restriction after receiving information that she had discontinued OxyContin. (Henke Depo., Doc. 21 at PageID 95-97, 112, 117).

Viewed as a whole, this evidence presents a genuine factual dispute as to whether the resulting driving restriction was based on an individualized assessment of Plaintiff's actual condition and ability to perform the essential functions of the MEO-2 position. Because a reasonable jury could resolve that dispute in either direction, neither party is

entitled to summary judgment on Plaintiff's claim arising from the FFD evaluation and resulting driving restriction. *See, e.g., Holiday*, 206 F.3d at 644 (concluding that a physician's failure to investigate actual effects of plaintiff's medical condition created a genuine issue of material fact as to whether his opinion resulted from the individualized inquiry required by the ADA).

**B. Disability Discrimination and Failure to Accommodate**

The same factual dispute also precludes summary judgment on Plaintiff's failure to accommodate claim. The ADA defines discrimination to include an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," absent undue hardship. 42 U.S.C. § 12112(b)(5)(A). A plaintiff asserting a failure-to-accommodate claim may establish that she is otherwise qualified by showing that she can perform the essential functions of her position without accommodation or with a reasonable accommodation. *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 368-69 (6th Cir. 2024); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007). Failure-to-accommodate claims therefore include those in which an employee claims that she can perform her job as it exists, without accommodation. *Cooper*, 93 F.4th at 369 (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1182 (6th Cir. 1996)).

Plaintiff proceeds under that theory. She maintains that she required no accommodation to perform the MEO-2 position because she remained capable of performing its essential driving function and the City improperly removed her from that position based on Dr. Henke's driving restriction. (*See* Doc. 32 at PageID 780-781). Defendants, by contrast, contend that the restriction rendered Plaintiff unable to perform

an essential function of the position and it reasonably accommodated her by offering reassignment to four vacant positions that did not require driving, each of which Plaintiff declined. (*See* Doc. 36 at PageID 908-911; Doc. 37 at PageID 928-29). Thus, although the parties dispute whether the proposed reassignments constituted reasonable accommodations and the effect of Plaintiff's declining them, those issues depend substantially on the predicate dispute addressed above—whether Plaintiff was capable of performing the essential functions of her position without accommodation.

Reassignment to a vacant position may constitute a reasonable accommodation under the ADA. 42 U.S.C. § 12111(9)(B); *Kleiber*, 485 F.3d at 869-70. Moreover, as argued by Defendants, reassignment to a lower-paying position is not necessarily unreasonable where an employee cannot be accommodated in her current position and no comparable position is available. *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998). If an employee declines a reasonable accommodation that would enable her to perform the essential functions of her position and, as a result, cannot perform those functions, she may no longer be considered a qualified individual. 29 C.F.R. § 1630.9(d); *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457-58 (6th Cir. 2004).

However, the above principles do not resolve the parties' motions because Defendants' reassignment argument depends on the premise that Plaintiff could not perform the essential driving function of the MEO-2 position. If the driving restriction accurately reflected Plaintiff's inability to perform that function, the City's offer of vacant alternate positions—and Plaintiff's rejection of them—would bear directly on whether she remained a qualified individual and whether the City satisfied its accommodation obligations. But if, as Plaintiff argues, she remained capable of working as a MEO-2

without accommodation, reassignment was not necessary to enable her to perform the essential functions of that position. *See Cooper*, 93 F.4th at 369 (recognizing a failure-to-accommodate claim where the employee maintains that he is otherwise qualified to perform his job as it exists without accommodation). In that circumstance, Plaintiff's rejection of the proposed reassignments would not establish that she was unqualified to perform the MEO-2 position. *See* 29 C.F.R. § 1630.9(d).

Because, as discussed above, a genuine dispute of material fact remains concerning the individualized basis for the driving restriction and Plaintiff's ability to perform the essential functions of the MEO-2 position, the Court cannot determine as a matter of law whether reassignment was necessary or what effect Plaintiff's rejection of the proposed positions had on her ADA claims. Accordingly, neither party is entitled to summary judgment on Plaintiff's failure-to-accommodate claim.

Defendants also contend that the City's reliance on Dr. Henke's medical opinion constituted a legitimate, nondiscriminatory reason for its employment decisions and that, even if Henke's assessment was incorrect, the City is protected by the honest-belief rule. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998); *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895-97 (6th Cir. 2016). The honest-belief rule does not require an employer's decision to be correct, nor does it require an optimal investigation. *Smith*, 155 F.3d at 807. It does require that the employer make a reasonably informed and considered decision by reasonably relying on the particularized facts before it at the time of the decision. *Id.*

As discussed above, genuine factual disputes remain as to whether Dr. Henke's driving restriction resulted from an individualized assessment of Plaintiff's ability to

perform the MEO-2 position or instead rested on generalized assumptions concerning her medications. Those same disputes do not necessarily defeat the City's honest-belief defense, but they bear on whether its reliance on Dr. Henke's determination was reasonably informed and based on particularized facts concerning Plaintiff. The record indicates that City officials accepted and relied on Dr. Henke's determination and transmitted Plaintiff's additional medical information to him for review. (Brown Depo., Doc. 27 at PageID 657, 684; Seward Depo., Doc. 25 at PageID 520). But the evidence concerning the basis for Henke's continuing restriction—including his testimony regarding the absence of direct evidence of impairment, the limited functional evaluation performed, and reliance on generalized information concerning opioid use—again permits competing inferences as to whether the City's reliance was reasonably based on particularized facts concerning Plaintiff. (Henke Depo., Doc. 21 at PageID 106-112, 118-19). *See Ferrari*, 826 F.3d at 895-97 (applying the honest-belief rule where the employer reasonably relied on a physician's work restrictions following a thorough medical evaluation); *cf. Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515-16 (6th Cir. 2021) ("If there is sufficient evidence for a reasonable jury to find the employer did not have an honest belief in its proffered reason that was based on a proper investigation, summary judgment must be denied."). Accordingly, the honest-belief rule does not entitle Defendants to summary judgment on Plaintiff's disability-discrimination claim.

**C. Retaliation**

The parties also both move for summary judgment on Plaintiff's ADA retaliation claim. To make out a *prima facie* case of retaliation under the ADA, Plaintiff must show: (1) that she engaged in protected activity; (2) that Defendants knew about the protected

activity; (3) that Defendants took an adverse employment action against her; and (4) that there was a causal connection between the protected activity and the adverse action. *See Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing *A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th 2013). Where the claim proceeds through circumstantial evidence, the familiar *McDonnell Douglas* framework applies. *Id.* Ultimately, Plaintiff must established that her protected activity was a but-for cause of the adverse employment action. *See Pemberton v. Bell's Brewery, Inc.*, 150 F.4th 751, 767 (6th Cir. 2025).

In this case, Plaintiff has presented sufficient evidence to establish a prima facie case of retaliation, including evidence that she engaged in protected activity by opposing what she believed to be unlawful disability discrimination, that Defendants were aware of that activity, and that she subsequently suffered materially adverse employment actions under circumstances sufficient to permit an inference of causation. (Stinson Depo., Doc. 23 at PageID 208-09, 438; Seward Depo., Doc. 25 at PageID 489-90, 526-27; Brown Depo., Doc. 27 at PageID 668-69). Plaintiff's December 2023 driving restriction preceded her January 2, 2024 written opposition and, therefore, could not itself have been caused by that protected activity. The relevant question instead concerns the employment actions that followed, including the termination of Plaintiff's light-duty assignment, her placement on unpaid status, and her eventual separation. (Stinson Depo., Doc. 23 at PageID 276-82, 303-11, 462).

Defendants have, in turn, articulated legitimate, non-retaliatory reasons for the challenged actions, including Plaintiff's continuing driving restriction, the asserted unavailability of continued light-duty work, and Plaintiff's rejection of the alternative

positions. They further contend that the time preceding Plaintiff's separation resulted from continued consideration of medical information and the grievance process. (*See* Doc. 36 at PageID 915). Plaintiff, by contrast, relies on the temporal relationship between her protected activity and the later employment actions, evidence concerning the City's treatment of her light-duty assignment, the City's knowledge of her complaints, and Brown's testimony that Plaintiff's grievances "delayed the termination process." (Brown Depo., Doc. 27 at PageID 669).

Brown's statement does not, standing alone, establish retaliatory causation. Additionally, it is consistent with Defendants' explanation that the City allowed the grievance process to run its course before completing the separation. But, viewed in conjunction with the timing of the challenged employment actions and Plaintiff's evidence concerning her removal from light duty and continued unpaid status, the evidence permits competing inferences as to whether the City's treatment of Plaintiff following her protected activity was retaliatory. At summary judgment, the Court may not select between those competing inferences, particularly here where the legitimacy of the underlying medical restriction and the City's reliance on it are themselves disputed.

Viewing the evidence in the light most favorable to the nonmoving party on each motion, a reasonable jury could find either that the City's post-complaint actions resulted from reliance on the driving restriction and Plaintiff's declination of alternative positions, or that Plaintiff's opposition was a but-for cause of one or more materially adverse actions. Accordingly, neither party is entitled to summary judgment on Plaintiff's retaliation claim.

**IV. ADEA Claims (Count II)**

Defendants move for summary judgment on Plaintiff's claims brought under the ADEA. In response, Plaintiff indicates that she does not intend to pursue her ADEA claim at trial and does not oppose dismissal of Count II of the Amended Complaint. (Doc. 39 at PageID 952). Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiff's ADEA claims.

**V. 42 U.S.C. § 1983 Claims (Count III)**

Finally, Defendants have not demonstrated entitlement to summary judgment on Plaintiff's claims brought under § 1983. Defendants correctly observe that a municipal-liability claim under 42 U.S.C. § 1983 requires an underlying constitutional violation and a violation of the ADA, standing alone, does not establish such a violation. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The ADA does not, however, preclude an independent § 1983 claim alleging a violation of the Equal Protection Clause. *See Bullington v. Bedford Cnty.*, 905 F.3d 467, 477-78 (6th Cir. 2018).

In this case, Plaintiff's § 1983 claim is not premised solely on a statutory ADA violation. Plaintiff alleges that Defendants' FFD practices subjected employees with disability-related prescription medication use to differential treatment without a rational basis, in violation of the Equal Protection Clause, and that the alleged constitutional violation stemmed from City policy, custom, and/or failure to train or supervise.

Defendants do not meaningfully address Plaintiff's constitutional claim or supporting evidence. Plaintiff sets forth evidence that the City contractually retained responsibility for compliance with federal law and employment decisions based on its medical-services contractor's information (*see* Doc. 39 at PageID 961-62); that Dr. Henke

allegedly received no training on ADA requirements (Henke Depo., Doc. 21 at PageID 121); that no City official reviewed his conclusions for ADA compliance (Brown Depo., Doc. 27 at PageID 670); and that City officials accepted and relied on his findings in making decisions concerning Plaintiff's employment. (*Id.* at PageID 684). Plaintiff identifies HR Director Latisha Hazell, in consultation with MSD Executive Director Diana Christy, as the official who made the medical-separation decision. (Doc. 39 at PageID 967; Seward Depo., Doc. 25 at PageID 518). Defendants do not address whether Plaintiff's allegations and evidence could establish an independent equal-protection violation, nor do they explain why Plaintiff's alleged failure to identify a final policymaker necessarily defeats her alternative policy, custom, or failure-to-train theories. Defendants did not file a reply addressing Plaintiff's response on these issues.

The Court expresses no view as to whether this evidence will ultimately establish a constitutional violation or municipal liability. However, on the arguments presented, Defendants have not demonstrated the absence of a genuine dispute of material fact or that they are entitled to judgment as a matter of law on Count III. Their motion is therefore **DENIED** as to Count III.

## VI. Conclusion

For the reasons stated, Plaintiff's Motion for Partial Summary Judgment (Doc. 31) is **DENIED**. Defendants' Motion for Summary Judgment (Doc. 36) is **GRANTED in part** as to Count II and **DENIED in part** as to Counts I and III.

**IT IS SO ORDERED.**

*s/Stephanie K. Bowman*
Stephanie K. Bowman
Chief United States Magistrate Judge